THE S. & H. NO. 5.

UNITED STATES v. CITY OF NEW YORK.

Nos. 17870, 17883.

District Court, E. D. New York.

June 3, 1946.

Gerard M. McAllister, of New York City, for libellant Sullivan Dry Dock & Repair Corporation.

T. Vincent Keogh, of Brooklyn, N. Y., U. S. Atty., and Vincent Catoggio and John Quarto, both of New York City, Sp. Assts. to the U. S. Atty., for the United States.

Foley & Martin, of New York City, (Christopher Heckman, of New York City, of counsel), for S. & H. Tugboat Co.

John J. Bennett, Corp. Counsel, of New York City (George S. Franklin and Edwin M. Bourke, both of New York City, of counsel), for the City of New York.

GALSTON, District Judge.

It was stipulated that these two actions be tried together. The litigations arose as an aftermath of the tugboat strike in the Harbor of New York, which had led to a declaration of the existence of a state of public emergency by the Mayor of the City of New York and the issuance by the President of the United States of Executive Order No. 9693, dated February 5, 1946. The filing of the libel of the Sullivan Dry Dock & Repair Corporation against the tug S. & H. No. 5 was followed by the petition of the S. & H. Tugboat Company impleading the United States of America and the City of New York.

Included in the seizure by the United States Government of various tugboats in the Harbor of New York was the tug S. & H. No. 5. By arrangement between the Office of Defense Transportation, a federal agency, and officials of the City of New York, the City provided crews for the manning and operation of some of such tugboats, including the S. & H. No. 5. On February 13, 1946, that tug was sunk, one day after it had been commandeered. Subsequently it was raised and taken to the plant of the Sullivan Dry Dock & Repair Corporation. The proof leaves no doubt that the libellant in the first entitled case is entitled to be compensated for the fair and reasonable value of the materials supplied

and the salvage services rendered to the tug. The subsequent discussion herein will disclose that such decree shall be against the impleaded respondents, with primary liability as to the City of New York, and secondary liability against the United States of America, and the libel dismissed as against the owners of the tug.

The second libel is that of the United States of America against the City of New York. As amended at the trial, it is claimed that the sinking of the tug S. & H. No. 5 and the consequent damages were caused solely by the negligence of the City of New York.

On February 5, 1946, acting under the authority of the Executive Order heretofore referred to, excerpts of which are quoted in the margin,[1] the Director of the Office of Defense Transportation appointed Laurence C. Turner as Federal Manager and ordered him to: "arrange for the operation of the systems and properties taken * * * in such manner as may be necessary to carry out * * * the purposes of the Executive Order, * * * with the aid of such public or private agencies * * * as he may designate".

Turner thereafter assumed control of tugboats and other vessels in and around New York Harbor for the purpose particularly of expediting the transportation of fuel. Some few days after Turner had assumed authority, he was informed by officials of the City of New York that the fuel requirements of the City of New York were not being met. At the same time Turner was advised by the Police Commissioner of the City of New York, and the Commissioner of Marine and Aviation, that the City of New York could supply from its employment rolls crews sufficient in number to operate five tugs, and requested Turner to assign tugs for such operation by such crews. Tugs were so assigned and among them was the tug S. & H. No. 5. That tug at the time was afloat at the plant of the Sullivan Dry Dock & Repair Corporation.

On the morning of February 12, Captain Moore, acting for the Office of Defense Transportation, informed the Sound & Harbor, Inc., operators of the tug, that the Office of Defense Transportation was about to commence operation of the S. & H. No. 5. Some time in the afternoon of that day a crew furnished by the City of New York boarded the tug. It was towed to Pier A, Battery, by the tug Manhattan, owned and operated by the City of New York. The S. & H. No. 5 is a medium sized, shallow draft tug of wood with coal operating steam engines. She had been in operation, doing harbor towing for a period of six months

[1] "Whereas after investigation I find and proclaim that as a result of a labor disturbance there are existing interruptions of the operations of transportation systems, plants, and facilities owned or operated by companies conducting towing and transportation operations in New York Harbor and contiguous waters (including but not limited to the transportation systems, plants, and facilities of the companies named in the list attached hereto and made a part hereof * * *); that the war effort will be unduly impeded and delayed by such interruptions; that it has become necessary to take possession and assume control of said transportation systems, plants, and facilities for purposes that are needful or desirable in connection with the present wartime emergency; and that the exercise, as hereinafter specified, of the powers vested in me is necessary to insure in the national interest the operation of the said transportation systems, plants, and facilities: * * * * * *

"1. The Director of the Office of Defense Transportation is authorized and directed, through or with the aid of any public officers, Federal agencies, or other governmental instrumentalities that he may designate. to take possession and assume control of the said transportation systems, plants, and facilities owned or operated by companies conducting towing or transportation operations in New York Harbor and contiguous waters (including but not limited to the. transportation systems, plants, and facilities of the companies named in the list attached hereto and made a part hereof * * * ), including all real and personal property and other assets used or useful in connection with the operation of such transportation systems, plants, and facilities, and to operate or arrange for the operation of said transportation systems, plants, and facilities in such manner as he may deem necessary to carry out the provisions and to accomplish the purposes of this order."

prior to the calling of the strike. Shortly after the strike was called, as a safety precaution her owners put her in the Sullivan Dry Dock plant to be sure that she would receive the necessary supervision during the strike period.

It is important to note that during the towage from the plant of the Dry Dock to Pier A, those on board, all of whom were City employees, observed that the tug was leaking. But Galloway, the supervising chief and marine engineer, testified that from his observation the tug's syphons were taking care of the water at the time, and that during the trip he found nothing unusual about the condition of the vessel.

On arrival at Pier A, O'Regan, a mechanical engineer employed by the City Department of Marine and Aviation, issued orders to survey the tug S. & H. No. 5. The report received between 5 and 6 p. m. was that the tug was leaking. Thereupon he instructed the engineer to pump the vessel free of water.

To operate the tug it was necessary to obtain fuel. The Office of Defense Transportation informed the City representatives that fuel for the tug could be obtained at St. George, Staten Island, or the Berwind-White plant at Communipaw, New Jersey, or at the D. L. & W. Railroad at Hoboken, New Jersey. O'Regan selected the Berwind-White source of supply and ordered the Manhattan to tow the S. & H. No. 5 to Communipaw, Jersey City. There coal was placed in the S. & H. No. 5's bunkers and she was again towed back to Pier A. At the pier her fresh water tanks were filled by Hickman, a supervising captain of the Department of Marine and Aviation, Bureau of Ferries, for the City of New York.

It seems an inescapable conclusion that had the tug been attended at Pier A after having returned from Communipaw, the sinking could have been avoided. The City people knew that the S. & H. No. 5 had been leaking and that O'Regan had issued orders, as he testified, "that men be stationed on watch on the tug during the night to cover her until the following day". He also said: "It is our custom in marine practice, with a vessel with steam up, to retain a stoker aboard to keep steam up at night time." A stoker was assigned for the watch from 4 p.m. to midnight on February 12, and a stoker was expected to relieve him and stay aboard the vessel from 12 to 8 a.m. on February 13. The first stroker went on board on February 12 at about 5 p.m. and stayed there until 12:45 a.m. on the 13th. He syphoned the bilges twice for about 20 minutes each time. When he left there was no one on board. He said that at that time the vessel was dry. Taggart, also a stoker employed by the Department of Marine and Aviation, had been ordered to report to the S. & H. No. 5 at midnight. He said he went over to Pier A from Staten Island, looked around for the tug but could not find it. After communicating by telephone with the City office in Staten Island to that effect he visited Pier A a second time, taking Sloan, a deck hand, with him, and looked for the tug. Neither boarded the S. & H. No. 5. Taggart, instead boarded another tug and remained thereon until the following morning. The S. & H. No. 5 was in consequence unattended throughout the night and in the morning was found submerged, her lines made fast to the south side of Pier A.

The tug was raised on February 16 and was placed in the Sullivan Dry Dock the same day. At that time the tug's main house was missing and, as McAllister of the Sullivan plant testified, ."the wheel house was askew and what was left of the forward end of the house. The stack of the exhaust pipes were off the vessel entirely * * *".

On February 21, the Sound & Harbor, Inc., was informed by the Office of Defense Transportation that it was releasing the tug in her then condition.

■■ From all of the foregoing I conclude that it was the negligence of employees of the City of New York which was the proximate cause of the sinking of the tug. It is argued that it is illegal for the City of New York to direct its employees to perform services in connection with activities other than those of the City. New York City Charter, Sec. 898, provides: "No officer or employee of the city or of any of the counties within its limits shall detail or cause any officer or employee of the city of

of any of such counties to do or perform any service or work outside of his public office, work or employment; and any violation of this section shall constitute a misdemeanor."

Thus, unless the City is willing to admit that its officers and employees were doing an illegal act in working for the Office of Defense Transportation, in the circumstances a hardly sustainable contention, it must be concluded that in operating the tug the City was engaged in the business of the City. The members of the crew did not lose their identity as employees of the City and become agents of the United States because the Federal Government, as well as the City, was attempting to meet the public emergency. Under the authority of Ramsey v. New York Central Railroad Co., 269 N.Y. 219, 199 N.E. 65, 102 A.L.R. 511, the City, as the employer, cannot escape liability even on the assumption that the crew of the S. & H. No. 5 had been lent to the Federal Government. Certainly when the office of the Department of Marine and Aviation ordered Taggart to go on board, his failure to do so cannot be attributed to or bind the Federal Government. The negligence in this case was one of non-feasance for which the City is liable. See Moch Co. v. Rensselaer Water Co., 247 N.Y. 160, 159 N.E. 708, 57 A.L.R. 934; also Siegel v. Spear, 234 N.Y. 479, 138 N.E. 414, 26 A.L.R. 1205.

As has been said hereinbefore, the Sullivan Dry Dock & Repair Corporation is entitled to a decree for the reasonable value of its services. The City of New York is to be held primarily liable, and the United States of America secondarily liable to the libellant, and the libel against the S. & H. No. 5 should be dismissed.

The answer of the City of New York to the libel of the Government alleges that the Government failed to have the tug surveyed to determine her condition at the time that she was commandeered, and that the Government knew or should have known that the tug was unseaworthy, leaking and unfit for the tasks assigned to her by the Government.

The difficulty is that there was no proof offered to show either that the boat was seaworthy or unseaworthy at the time that the Government took possession of the tug.

On February 12 and prior to the taking by the Government, the Office of Defense Transportation was notified by letter that the Sound & Harbor, Inc., made no representation regarding the condition of the tug; that it requested a joint survey to determine her condition upon being taken by the Government, and that the owners had no insurance covering the tug or her liability. It would seem that the Government in order to hold the City of New York liable for negligent operation, should have caused a survey to be made. So too it would seem that the City of New York was justified in assuming, when asked by the Government to furnish a crew and operate the tug, that the tug was seaworthy. On the other hand, as has been observed hereinbefore, the City did find that the tug, during the trip from the dry dock to Pier A and on arrival at Pier A, was leaking. That put the City on notice that precaution was necessary in the operation of the tug. Moreover when the tug first arrived at Pier A, O'Regan ordered a survey by the city employees. If the condition as reported to him had been regarded as serious, the City engineers should immediately have notified the Office of Defense Transportation. They did not do so, but instead asked for instructions as to where to get coal.

Finally it is to be observed that although a claim has been made by the owners of the tug against the United States, no litigation has been instituted by the owners of the tug against either the Government or the City of New York. Thus in effect no damage has been suffered by the United States. It is true that its libel alleges that the United States was impleaded in the suit brought by the Sullivan Dry Dock & Repair Corporation against the tug S. & H. No. 5, but as has been indicated in the foregoing decision, the primary liability in that libel was found against the City of New York. However, the Government had commandeered the tug and the City undertook to man and operate the tug. In consequence the City was under obligation, save for normal wear and tear, to redeliver the tug in substantially the condition in which

it was at the time the City took possession. The City therefore should be held liable for such damages as resulted from the negligent acts of its employees. Despite the fact that no action has been brought against the United States by the owners of the tug, it does not appear that the City maintains that this libel has been prematurely filed. What the recovery by the United States can be remains in doubt until liability of the United States to the owners is established. An interlocutory decree for the ascertainment of such damage, if any, may be had by the Government.

With the filing of this opinion appropriate findings of fact and conclusions of law will also be filed.